UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,               CRIMINAL NO. 11-20345

v.                         HON. ARTHUR J. TARNOW

JOSEPH McMULLIN,

      Defendant.

---

## United States' Response Opposing the Defendant's Motion for Compassionate Release

---

In 2011, while on parole for drug offenses, McMullin carried a loaded firearm in his waistband. As an Armed Career Criminal with an extensive criminal history, he received a flat 15 year-sentence. Today, McMullin has served approximately 70% of his sentence. Although McMullin suffers from health conditions that place him at risk of complications from Covid-19, he is at Butner Medium II FCI, a facility with only two current infections among inmates. *See* BOP Covid-19 Website. McMullin has had disciplinary incidents while in custody, and

BOP rates his recidivism risk as "high." He has moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

McMullin does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although McMullin's heightened risk from Covid-19 based on his type 2 diabetes and chronic kidney disease qualifies as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), McMullin is not otherwise eligible for release. McMullin's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he has a long and unabated criminal history. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because McMullin has not presented the Court with any information about where he would live if he was released or any sort of release plan. Based on his past conduct, McMullin's risk to reoffend is high, and he is dangerous.

The Bureau of Prisons has also taken significant steps to protect all inmates, including McMullin, from Covid-19. Since January 2020, the

Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of September 25, 2020, this process has already resulted in at least 7,699 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least 130 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny McMullin's motion for compassionate release.

## Background

In 2011, McMullin had a lengthy criminal history: ten felonies and two misdemeanors. (PSR ¶ 100.) Despite this, on May 4, 2011, McMullin possessed a loaded firearm that police recovered from his waistband. Because he'd previously been convicted of at least three serious drug offenses and/or violent felonies, he qualified as an Armed Career

Criminal (18 U.S.C. § 924(e)) and received a sentence of 180 months under that statute.

McMullin began serving his prison sentence in 2012, and he is currently incarcerated at Butner Medium II FCI. He is 51 years old, and his projected release date is April 5, 2024. His underlying medical conditions are diabetes, hypertension, kidney disease, and high cholesterol. (BOP records, McMULLIN_0001-286, submitted under seal seal as Exhibit A). McMullin has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. McMullin provided the Court with a document he claims to have submitted to the BOP requesting compassionate release (ECF. No. 88, PageID 496.) However, BOP has no record of having received McMullin's request. McMullin has not provided the Court with a release plan. At the time of his offense in 2011, he was homeless. (PSR ¶ 13.)

## Argument

## I.     The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A.     The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th

Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing

quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.     The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent

legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,699 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem

appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid

the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate

for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of

Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny McMullin's motion for compassionate release.

McMullin's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir.

2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36. Here, McMullin has provided the Court with a request to the warden for compassionate release that he appears to have submitted on July 10, 2020. (ECF. No. 88, PageID 496.) Counsel for the government attempted to confirm with BOP that the institution had received this request, but BOP had no record of the request.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### B.   McMullin is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A).

The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to McMullin and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

McMullin's medical records, however, establish that he has type 2 diabetes mellitus and chronic kidney disease, which the CDC has

confirmed are risk factors that place a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with those medical conditions, McMullin has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But McMullin remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL

3055987, at \*3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No.
2:17-cr-20489, 2020 WL 2768852, at \*7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which
§ 1B1.13(2) references for its dangerousness determination—requires a
comprehensive view of community safety, "a broader construction than
the mere danger of physical violence." *United States v. Cook*, 880 F.2d
1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering
*pretrial* detention under § 3142(g), "[t]he concept of a defendant's
dangerousness encompasses more than merely the danger of harm
involving physical violence." *United States v. Williams*, No. 20-1413, 2020
WL 4000854, at \*1 (6th Cir. July 15, 2020) (citing *United States v. Vance*,
851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more
strongly post-judgment, when the defendant's presumption of innocence
has been displaced by a guilty plea or jury's verdict and when "the
principle of finality" becomes "essential to the operation of our criminal
justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the
release of violent offenders. It bars the release of most drug dealers, "even
without any indication that the defendant has engaged in violence."

*United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect.

Because McMullin's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). BOP rates McMullin's risk to recidivate or reoffend as "high." (Exhibit A, McMULLIN_0286.) While incarcerated, McMullin has had six disciplinary incidents. (Ex. A, McMULLIN_0001-0002.)

McMullin's extensive criminal history demonstrates that he presents a danger to the community. In 1995, when McMullin was 26, he was convicted of his first drug offense: possession with intent to distribute cocaine and delivery of cocaine, and sentenced to lifetime probation. (PSR ¶ 29-30.) In 1998 and 2000, he violated probation by committing new crimes. In 1997, at the age of 28, McMullin was convicted

of felonious assault, and sentenced to 365 days imprisonment. (PSR ¶ 32.) In 1998, McMullin was convicted of failure to stop at the scene of an accident, fleeing and eluding, and driving while license suspended. In 1999, McMullin was convicted of possession of heroin and domestic violence, and sentenced to probation. (PSR ¶ 34.) A probation violation was filed in 2000, after McMullin tested positive for marijuana and cocaine. In 2000, McMullin was again convicted of possession of heroin and marijuana, and in 2001, he was convicted of delivery/manufacture of heroin. (PSR ¶ 35.) In 2001, at the age of 32, McMullin was convicted of delivery/manufacture of heroin, and sentenced to 1 to 20 years imprisonment. (PSR ¶ 36.) In 2004, McMullin was convicted of domestic violence, and sentenced to 18 months' probation. (PSR ¶ 37.) In 2008, at age 38, McMullin was convicted of possession of cocaine, and sentenced to 120-150 days in jail, and two years' probation. (PSR ¶ 38.) A few months later, McMullin was charged and convicted with possession of cocaine and marijuana, and operating while license suspended and sentenced to 18 months to 15 years in custody. (PSR ¶ 39.)

In 2011, McMullin was arrested with a loaded firearm in his waistband. At the time, he was on parole for his 2008 convictions.

According to his PSR, McMullin had a total of 17 criminal history points. (PSR ¶ 43.) The highest criminal history category is a level VI, which is awarded to defendants with 13 or more criminal history points. McMullin had four points in excess of the 13 required for the highest criminal history category.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v.*

*Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find McMullin eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Under 18 U.S.C. § 924(e), felons that possess firearms after three previous convictions for violent felonies and/or serious drug offenses must be sentenced to at least 15 years in prison. McMullin's prior convictions qualified him as a career offender. (ECF No. 83, PageID 474-483.) In addition, McMullin's history and characteristics weigh strongly against release. Not only does he have an extensive criminal history, but he was homeless at the time of his offense in 2011, and he has presented the Court with no information about where he would live and how he would successfully re-enter society. When he was sentenced, McMullin told the Probation Department that he would live with his father in Clinton Township upon release, but his father told Probation that his Section 8 housing rules would not allow his son to live with him. (PSR ¶ 62.)

## III.  If the Court were to grant McMullin's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant McMullin's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

McMullin's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER,
United States Attorney

s/Sara D. Woodward
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9180
E-Mail: sara.woodward@usdoj.gov

Dated: September 25, 2020

## Certificate of Service

I hereby certify that on September 25, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Sara D. Woodward
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9810
sara.woodward@usdoj.gov

September 25, 2020